LAW OFFICES OF KARINE BASMADJIAN
Karine Basmadjian (SBN 170709)
520 East Wilson Avenue Suite 220
Glendale, CA 91206
Telephone: (818) 500-3921
Fascimile: (818)
Email: karineblaw@sbcglobal.net

Attorney for Defendant
HAYK KAZARYAN

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No:  CR 12-00459 |
| Plaintiff, | DEFENDANT HAYK KAZARYAN'S SENTENCING POSITION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPORT THEREOF; EXHIBITS |
| vs. | |
| HAYK KAZARYAN, | Date: November 16, 2015 Time: 11:00 AM |
| Defendant. | |

Defendant HAYK KAZARYAN, by and through his attorney of record, KARINE BASMADJIAN, hereby submits his Sentencing Memorandum pursuant to Federal Rule of Criminal Procedure 32, setting forth the factors the Court should consider in determining what type of sentence is "sufficient, but not greater than necessary" to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).

For the reasons set forth in the attached memorandum, Mr. Kazaryan respectfully requests that the Court impose a mandatory minimum sentence of sixty (60) months imprisonment to be followed by a three (3) year term of supervised release under such terms and conditions the Court deems just and proper in this case.. The requested sentence would be "sufficient, but not greater than necessary" to achieve the purposes of sentencing.

Date: October _14__, 2015.

Respectfully submitted,

/s/ *Karine Basmadjian*
KARINE BASMADJIAN
Attorney for Defendant
HAYK KAZARYAN

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

On February 19, 2015, Hayk Kazaryan (Kazaryan) pled guilty to Counts 2 and 4 of a 4-Count Indictment in which he is solely named. Count 2 charges a violation of 21 U.S.C. §§ 841(a), (b)(1)(B):  Distribution of Methamphetamine. On August 16, 2011, Mr. Kazaryan distributed approximately 13.6 grams of methamphetamine. Count 4 charges a violation of 26 U.S.C. § 5861(d): Possession of Unregistered Firearm.   On February 8, 2011, Mr. Kazaryan possessed a 12-gauge semi-automatic short-barreled shotgun which had not been registered to him in the National Firearms Registration and Transfer Record as required by Chapter 53, Title 26, United States Code.

## II.

## PLEA AGREEMENT

Under the term of the plea agreement, the parties agreed to the following Guideline calculations:

| | |
|---|---|
| Base Offense Level for Count II<br>U.S.S.G. 2D1.1(c)(7) | + 26 |
| Base Offense Level for Count IV<br>U.S.S.G. 2K2.1(a)(4) | +18 |

The parties reserve the right to argue that additional specific offense characteristics, adjustments and departures apply and for a sentence outside the

guideline range pursuant to 18 U.S.C. §3553. The government agreed to dismiss the remaining counts of the Indictment. In addition, it agrees to apply a two or three-level reduction for acceptance of responsibility as appropriate pursuant to U.S.S.G. § 3E1.1. Moreover, the government agrees to a low-end guideline sentence, provided that the offense level is 23 or higher.

III.

## PRESENTENCE INVESTIGATION REPORT

The USPO provided the sentencing guidelines as follows:

| | |
|---|---|
| Count II: Base Offense level, USSG § 2D1.1(c)(1) | +26 |
| Adjusted Offense Level | 26 |
| Count IV.: Base Offense Level USSG § 2K2.1(a)(5) | +18 |
| 3-7 Firearms Involved in Offense, USSG § 2K2.1(b)(1) | +2 |
| Adjusted Offense Level | 20 |
| Multiple Count Adjustment, USSG § 3D1.4 | +1 |
| Combined Adjusted Offense Level | 27 |
| Acceptance of Responsibility , USSG § 3E1.1 (a) | -3 |
| Total Adjusted Offense Level | 24 |

The resulting sentencing range is 92-115 months imprisonment as a Category V Offender, with a statutory mandatory minimum sentence of sixty months. The USPO recommended the Court impose a term of 76 months imprisonment, to be followed by 3 years of supervised release. The USPO further recommended the Court order the defendant to pay $308,610.10 in restitution with a partial payment of $120,000.00 to be paid within 30 days of sentencing. In recommending this sentence, the USPO found a variance was warranted due to the fact that his criminal history category was increased based on conduct related to his drug addiction and therefore recommended a variance in his criminal history category that resulted in a 16 month decrease in his sentence.

IV.

## DISCUSSION

### A.   SENTENCING PRINCIPLES

Under the principles set forth in *United States v. Booker*, 543 U.S. 220 (2005), the Federal Sentencing Guidelines are purely advisory. Since *Booker*, the Supreme Court handed down *Rita v. United States*, ___ U.S. ___, 127 S.Ct. 2456 (2007), *Gall v. United States*, ___ U.S. ___, 127 S.Ct. 2933 (2007) and *Kimbrough v. United States*, ___ U.S. ___, 128 S.Ct. 558 (2007) superseding how the courts approached the sentencing process in the post *Booker* era..

Under *Rita*, *Gall*, and *Kimbrough*, it is settled that the overarching statutory charge for a district court is to "impose a sentence sufficient, but not greater than

necessary" to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment.   18 U.S.C. § 3553(a) and (a)(2).

"All sentencing proceedings are to begin by determining the applicable Guidelines range.     The range must be calculated correctly. In this sense, the Guidelines are "the 'starting point and the initial benchmark,' " *Kimbrough*, 128 S.Ct. at 574 (*quoting Gall*, 128 S.Ct. at 596), and are to be kept in mind throughout the process, *Gall*, 128 S.Ct. at 596-97 n. 6." *Ibid.*

The parties must be given a chance to argue for a sentence they believe is appropriate.

The district court should then consider the § 3553(a) factors to decide if they support the sentence suggested by the parties, i.e., it should consider the nature and circumstances of the offense and the history and characteristics of the defendant;  the need for the sentence imposed;  the kinds of sentences available;  the kinds of sentence and the sentencing range established in the Guidelines;  any pertinent policy statement issued by the Sentencing Commission;  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;  and the need to provide restitution to any victims.   18 U.S.C. § 3553(a)(1)-(7);  *Gall*, 128 S.Ct. at 596-97 n. 6.

The district court may not presume that the Guidelines range is reasonable. *Rita*, 127 S.Ct. at 2465 (*citing Booker*, 543 U.S. at 259-60, 125 S.Ct. 738); *Gall*, 128 S.Ct. at 596-97.   Nor should the Guidelines factor be given more or less weight than any other. *Id.* While the Guidelines are to be respectfully considered, they are one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence.   *Kimbrough*, 128 S.Ct. at 570; *Gall*, 128 S.Ct. at 594, 596-97, 602.

The district court must make an individualized determination based on the facts.   However, the district judge is not obliged to raise every possibly relevant issue *sua sponte*.   *Gall*, 128 S.Ct. at 597, 599.

If a district judge "decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id*. at 597.   This does not mean that the district court's discretion is constrained by distance alone. Rather, the extent of the difference is simply a relevant consideration.   At the same time, as the Court put it, "[w]e find it uncontroversial that a major departure should be supported by a more significant justification than a minor one." *Id*. This conclusion finds natural support in the structure of § 3553(a), for the greater the variance, the more persuasive the justification will likely be because other values reflected in § 3553(a)-such as, for example, unwarranted disparity-may figure more heavily in the balance.

7

In determining the sentence minimally sufficient to comply with or meet these aims, a sentencing court must consider factors listed in §3553(a), which includes:

    (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2)    the need for the sentence imposed—

        (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B)    to afford adequate deterrence to criminal conduct;

        (C)    to protect the public from further crimes of the defendant; and

        (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

    (3)    the kinds of sentences available;

    (4)    the kinds of sentence and the sentencing range established for—

        (A)    the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines; . . . .¶

    (5)    Any pertinent policy statements issued by the Sentencing Commission;

    (6)    The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

Neither Section 3553(a) nor *Booker* suggest that any of these circumstances is individually paramount. All of these factors, however, are

8

controlled by §3553(a)'s mandate to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes of sentencing.

Numerous appellate decisions from various circuit courts have clarified the role and approach of the sentencing court in the post-*Booker* era. The Ninth Circuit has held that "*Booker* empowered district courts, not appellate courts.... [and] breathe[d] life into the authority of district court judges to engage in individualized sentencing." *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) (citations omitted).

The Sixth Circuit has stated: "Many times we have emphasized that a district court's mandate is to impose a sentence sufficient, but not greater than necessary to comply with the purpose set forth in § 3553(a)(2)." *United States v. Yopp*, 453 F.3d 770, 773 (6th Cir. 2006).  The Sixth Circuit has further described the role of the sentencing court as follows: "[A] district court's job is not to impose a 'reasonable' sentence. Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2). Reasonableness is the *appellate* standard of review in judging whether a district court has accomplished its task." *United States v. Foreman*, 436 F.3d 638, 644 n.1 (6th Cir. 2006) (emphasis added). Furthermore, the Ninth Circuit has held that in weighing the sentencing decisions of a district court, the proper standard is abuse of discretion, and it will not "second guess" the court's

conclusions so long as they are reasonable. *United States v. Menyweather,* 447 F.3d 625, 633 (9th Cir. 2006).

Finally, the Seventh Circuit has instructed that post–*Rita v. United States*, 127 S.Ct. 2456 (2007), "[t]he district courts must calculate the advisory sentencing guideline range accurately, so that they can derive whatever insight the guidelines have to offer, but ultimately they must sentence based on 18 U.S.C. § 3553(a) without any thumb on the scale favoring a guideline sentence." *United States. v. Sachsenmaier*, 491 F.3d 680, 685 (7th Cir. 2007).

In determining whether to grant Mr. Kazaryan's requested sentence, the Court is respectfully asked to base its decision on the totality of the factors present in this case, and to consider the offender as well as the offense, keeping in mind that it is not "*severe* punishment that promotes respect for the law, it is *appropriate* punishment." *United States v. Olhovsky*, 562 F.3d 530, 549-51 (3d Cir. 2009) (emphasis in original); *see also Williams v. New York,* 337 U.S. 241, 247 (1949).

In determining whether to grant the Defendants requested sentence, the Court is respectfully asked to base its decision on the totality of the factors present in this case, and to consider the offender as well as the offense, keeping in mind that it is not "*severe* punishment that promotes respect for the law, it is *appropriate* punishment." *United States v. Olhovsky*, 562 F.3d 530, 549-51 (3d Cir. 2009) (emphasis in original); *see also Williams v. New York,* 337 U.S. 241, 247 (1949).

**B.   THE COURT SHOULD FIND A 32 MONTH UNDER SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a) VARIANCE BASED ON STRONG FAMILY TIES, POST-OFFENSE REHABILITATION, AND THE FACT THAT HE IS A NON-CITIZEN SUBJECT TO MANDATORY REMOVAL**

   1.  <u>The Nature and Circumstances of the Offense & The History and Characteristics of the Defendant</u>

The following social history of the Defendant is being provided in the spirit of 18 U.S.C. §3661, which states "that no limitation shall be placed on the information concerning the background, character and conduct of a person convicted of an offense which a Court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *Id*.

As discussed in the PSR, Mr. Kazaryan was born October 10, 1980, in Baku, Azerbaijan, to Oganes and Lala Kazaryan. Mr. Kazaryan's father is 58 and lives at 206 N. Keystone Street # C, Burbank, CA 91506.  He works as a taxi driver.  In regard to his health, he had a heart attack a few years ago and currently takes heart medication. Kazaryan's mother is 57 and lives with her husband and has been diagnosed with breast cancer and is currently undergoing treatment. Mr. Kazaryan's sister, Marta, is 32 and currently lives in New York.

Prior to coming to the United States, Mr. Kazaryan's family resided in various parts of the former Soviet Union ("USSR") and his childhood was difficult t in Azerbaijan as he was part of an Armenian minority and Azerbaijanis were hostile toward Armenians and wanted to kill them.  From 1988 until 1994,

the Nagorno-Karabakh war took place in a different part of Azerbaijan as ethnic Armenians in that area wished to secede from Azerbaijan and join Armenia. In January 1990, while Baku was still part of the USSR and the war was going on in the Nagorno-Karabak region, a massacre was directed against Armenians in Baku. Ninety Armenians were killed and another 700 were injured.

In 2001, Mr. Kazaryan's father traveled to Glendale and asked for political asylum. Mr. Kazaryan moved here to join his father in July 2001. Mr. Kazaryan's mother and sister joined their mother and father in 2002.

Attached hereto are character reference letters from friends and family members. These letters characterize him as gentle, kind, respectful, hardworking, and a valued family member. Although here legally, Mr. Kazaryan is not a U.S. Citizen and will be subject to removal proceedings once he is done with his prison sentence, and likely be deported.

Considering Mr. Kazaryan's family ties: Commission studies show that recidivism rates are lower for defendants who are or were ever married, even if divorced. See USSC, Measuring Recidivism, supra note 134, at 11. Other studies show that supportive family connections predict reduced recidivism,[1] while breaking up families leads to increased recidivism.[2]

---

[1]     Kimberly Bahna, "It's a Family Affair" – The Incarceration of the American Family: Confronting Legal and Social Issues, 28 U.S.F. L. Rev. 271, 285 (1994) (prisoners who have supportive families are less likely to recidivate); Shirley R. Klein et al., Inmate Family Functioning, 46 Int'l J. Offender Therapy & Comp. Criminology 95, 99-100 (2002) ("The

In 2003, a majority of district court judges indicated in a survey that more emphasis was needed on family ties and responsibilities. See Linda Drazga Maxfield, Office of Policy Analysis, USSC, Final Report: Survey of Article III Judges on the Federal Sentencing Guidelines, Chapter II (Mar. 2003), available at www.ussc.gov. It was in the same year that survey was issued, however, that Congress enacted the PROTECT Act and the Commission amended § 5H1.6 to make the departure provision governing family ties and circumstances more restrictive. Since *Booker* was decided, there has been a marked shift away from departure analysis for considering family ties and responsibilities, with courts increasingly relying on *Booker* and 18 U.S.C. § 3553(a) to avoid the restrictions in § 5H1.6 relating to family ties and responsibilities.

In 2003, for example, courts cited family ties and responsibilities 430 times as a reason for downward departure, or in 8.8% of cases in which a nongovernment-sponsored downward departure was granted.[3] By fiscal year 2008, courts cited family ties and responsibilities as a reason for a departure in

relationship between family ties and lower recidivism has been consistent across study populations, different periods, and different methodological procedures.").

[2]    The Sentencing Project, Incarceration and Crime: A Complex Relationship 7-8 (2005) ("The persistent removal of persons from the community to prison and their eventual return has a destabilizing effect that has been demonstrated to fray family and community bonds, and contribute to an increase in recidivism and future criminality."), available at http://www.sentencingproject.org/doc/publications/inc_iandc_complex.pdf

[3]    See USSC, 2003 Sourcebook of Federal Sentencing Statistics, tbl. 25A (2003).

only 182 cases in which a downward departure was granted, or just under 2% of all cases in which sentence below the guidelines was imposed.[4] However, free of the constraints of strict departure analysis, courts cited family ties and responsibilities as a reason for sentencing below the guideline range in cases in which a sentence below the guideline was imposed under Booker and 18 U.S.C. § 3553(a) in another 883 cases, almost five times as many cases, for a total rate of 11.7% of all cases in which a below-guideline sentence was imposed. *Id.*

In fiscal year 2009, courts cited family ties and responsibilities in 12.9% of cases in which a below-guideline sentence was imposed, again with the majority relying on § 3553(a) rather than § 5H1.6. See 2009 Sourcebook, tbls. 25, 25A & 25B.  And in fiscal year 2010, the rate was 12.3%, also with the vast majority under § 3553(a). See 2010 Sourcebook, tbls. 25, 25A & 25B. Of all the specific mitigating factors addressed in Chapter 5 of the Guidelines Manual, family ties and responsibilities are cited most often for imposing a sentence below the guidelines.

Considering the Defendant's substance abuse history and its relevance to sentencing, Mr. Kazaryan has a well established history of alcohol, marijuana, and methamphetamine use that began in 2009. During this stage of his life, methamphetamine was his drug of choice and substantially contributed to his

---

[4]    5 USSC, 2008 Sourcebook of Federal Sentencing Statistics, tbl. 25, 25A & 25B (2008).

decisions leading to the underlying offense. Mr. Kazaryan last used drugs prior to his arrest on November 30, 2011.  Following that, he remained in Los Angeles County and federal custody until April 30, 2013, a couple of days before he entered residential drug treatment.

From May 2, 2013, to August 2, 2013, while Mr. Kazaryan was under Pretrial Services Agency supervision, he successfully completed a three-month inpatient drug treatment program at Phoenix House in Venice.  An October 2013 letter from senior counselor Ronald Perales at Phoenix House stated that Mr. Kazaryan's treatment consisted of over 200 group episodes; AA (Alcoholics Anonymous), NA (Narcotics Anonymous), CMA (Crystal Meth Anonymous) and other recovery related groups; and individualized therapy.  This letter reflects that Mr. Kazaryan was seen as a sincere client who was able to apprehend important aspects about his behavior and the process that led him to be involved in the criminal justice system.  Mr. Perales added that he was very happy to write the letter on Mr. Kazaryan's behalf as Mr. Perales considers Mr. Kazaryan to be a "genuine success story."

According to the August 2013 Phoenix House discharge summary, "[Mr.] Kazaryan met his intended goals and met all program expectations.  He had a successful treatment episode and was a model client.  He was a peer and assisted many new clients in the house.  He appeared to have made significant alterations in his thinking which will allow him to consider the consequences of his actions

before engaging in behaviors that might jeopardize his freedom.  He was motivated to get value from treatment and seemed to gain value from the changes in his thinking process which changed over the course of his treatment.  He reported that in the past, he had not considered the consequences of his actions, indicating an important dimension of insight and maturity gained to his diligence while in treatment." [PSR  p. 21 ¶121]

From a medical standpoint, the discharge summary from a three-month residential treatment center at Phoenix House in Venice, Mr. Kazaryan's Axis I diagnoses at intake and at discharge were Amphetamine Abuse and Adjustment Disorder with Mixed Anxiety and Depressed Mood.  The discharge summary stated that Mr. Kazaryan has anxiety appropriate to his circumstances and that all other mental health issues are within normal limits at this time.  At intake, his Axis V General Assessment of Functioning (GAF) score was 49 out of 100.  No GAF score at discharge was provided on the discharge summary.  This discharge summary was prepared by clinician Ronald Perales, LMFT.

In October 2013 Mr. Kazaryan began dating Anna Mkrtchyan.  In July 2014, the couple became engaged and moved in together.  In October 2014, Mr. Kazaryan and Anna were married. Mr. Kazaryan lived with his wife in North Hollywood until he was remanded to custody on February 19, 2015, the date he pled guilty to the instant offense.

Despite the fact that the Guidelines were amended before *Booker* to prohibit downward departures for *post-sentencing* rehabilitative efforts, **post-offense** rehabilitation provides the basis for a downward variance. *Gall, supra* at 586. A "variance" outside the guideline range provided for in the *Guidelines Manual* should occur after consideration of all relevant departure provisions. *Id.* at 596. A court may grant a departure and a variance in the same sentence. *Ibid.*

In *Gall*, the defendant was arrested for a drug distributing conspiracy he took part in four years earlier. *Id.* at 592.  After defendant had given up drug distributing, he had graduated from college, began working successfully in the construction field, and hadn't sold or used drugs for almost 4 years. *Id.*  When hearing of his indictment, defendant voluntarily surrendered to the authorities and continued to work at his career while free on his own recognizance. *Id.*  The court held that a sentence of probation, instead of the recommended 30 to 37 month imprisonment per the *Guidelines Manual*, was justified. *Id.* at 601.

The court in *Gall* found that the variance was appropriate because of defendant's withdrawal from the conspiracy and defendant's post offense conduct, which showed that defendant would not return to criminal behavior and was not a danger to society. *Id.* at 602. *See also U.S. v. Brock,* 108 F.3d 31 (4th Cir 1997) (Judge imposed 144 months for cocaine base distribution conspiracy rather than apply the career offender range, stressing, among other things, defendant's particularly striking impression as a changed man who renounced his

former ways and renewed commitment to religion and family) *U.S. v. Martin*, 520 F.3d 87 (1st Cir. 2008);   (Probation granted, rather than guideline range of 30-37 months, for getaway driver in three bank robberies, because defendant totally changed his life and his behavior and treatment succeeded in producing a rehabilitated person unlikely to recidivate) *U.S. v. Parella*, 273 F. Supp. 2d 161 (D. Mass. 2003).

The Supreme Court would later reaffirm *Gall* in *Pepper v. United Sates*, 562 U.S. 476 (2011). In that case, the defendant, Jason Pepper, was charged with and pled guilty to a conspiracy to distribute methamphetamine. At the time, Pepper was 24 years old and had no prior convictions. Although the offense carried a ten-year mandatory minimum sentence, Pepper qualified for the "safety-valve" provision in 18 U.S.C. § 3553(f), which made the statutory minimum sentence optional because Pepper had no prior convictions. . Under the Federal Sentencing Guidelines, Pepper's base offense level was 30, resulting in a recommended sentence of 97 to 121 months' imprisonment. The government filed a motion asking for the court to decrease Pepper's prison sentence by 15% because of his cooperation in providing statements and grand jury testimony against two other defendants. The court granted the motion, but rather than decreasing the minimum recommended sentence by 15%, to 82 months, the court sentenced Pepper to 24 months' imprisonment and five years' supervised release, which was a 75% sentence decrease. The judge chose a 24-month sentence

because it was the minimum sentence which would still enable Pepper to qualify for an intensive drug treatment program at the Yankton, South Dakota federal prison camp.

The government appealed the sentence and the Eighth Circuit reversed and remanded for resentencing because it believed that the district court erred in considering factors besides the defendant's cooperation. According to the Eighth Circuit, the district court erroneously considered its own desire to sentence Pepper to the lowest possible term which would still allow for participation in the drug treatment program in Yankton. By the time of resentencing, Pepper had completed his drug treatment and 24-month prison sentence and had been on supervised release for ten months. During those ten months, Pepper obtained a part-time job, attended school full-time achieving straight A's, and complied with the terms of his supervised release.

On remand, the district court sentenced Pepper to 24 months' imprisonment. The court first granted a 40% sentence decrease for assisting investigators and then granted another 59% decrease to the original 24 months because of Pepper's lack of violent history, his post-sentencing history, and the disparity between Pepper's sentence and those of his co-defendants. The Eighth Circuit reversed and remanded because, while the 40% decrease for assisting the government was not an abuse of discretion, the district court based the additional 59% decrease on impermissible factors. The Eighth Circuit asserted that the

district court impermissibly double-counted Pepper's lack of criminal history in sentencing because the court did not sufficiently differentiate Pepper's lack of violent history from his lack of criminal history. The Eighth Circuit also held that post-sentencing rehabilitation is a prohibited factor in resentencing because it includes factors that could not have been used at the original sentencing.

Pepper appealed to the Supreme Court of the United States, which granted certiorari and vacated the decision, asking the Eighth Circuit to reconsider Pepper's case in light of *Gall v. United States*.

Here, as *Gall*, the Defendant's post-offense conduct shows he would not return to criminal behavior and is not a danger to society. Defendant understands the consequences of his criminal conduct and forged a new life. Defendant has clearly devoted his life to his family and society and is not the man he was when the underlying offense was committed.

In this case, the USPO recommended the Court find a 16 month variance in the sentence based on the grounds that the Defendants criminal history was in large part due to his substance abuse. While this is certainly true, the underlying offense, a controlled substance offense, is also directly the result of his past substance abuse problem and warrants a variance from 92 to 60 months, the already pre-established mandatory minimum sentence the Court may impose.

Thus based on the personal history and characteristics described above, considered in conjunction with the factors below, Defendant's requested sentence

is sufficient but not greater than necessary to serve the purpose of sentencing and thus far will allow Defendant to address his substance abuse issues with this Court's recommendation that he be enrolled into the 500 Hour RDAP Program offered by the BOP. Any additional imprisonment in this case would be counter effective and harmful towards Defendant's contributions and rehabilitation.

2.  The Need For The Sentence Imposed To — reflect the seriousness of the offense,  promote respect for the law, and provide just punishment for the offense; afford adequate deterrence; protect the public from further crimes of the defendant; provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

An alternative as opposed to a lengthy prison term is unnecessary to achieve the purposes of sentencing.  Research shows that the Guidelines' requirement for lengthy prison terms in nearly every case is unnecessary and counterproductive. *See* U.S.S.C., *Staff Discussion Paper*, *Sentencing Options Under the Guidelines,* 18-19 (Nov. 1996) (finding that "[m]any federal offenders who do not currently qualify for alternatives have relatively low risks of recidivism compared to offenders in state systems and to federal offenders on supervised release," and "alternatives divert offenders from the criminogenic effects of imprisonment which include contact with more serious offenders, disruption of legal employment, and weakening of family ties."); U.S.S.C., *Alternative Sentencing in the Federal Criminal Justice System*, at 2-3 (2009) ("alternatives to incarceration can provide a substitute for costly incarceration," and "also provide those offenders opportunities

by diverting them from prison (or reducing time spent in prison) and into programs providing the life skills and treatment necessary to become law-abiding and productive members of society.").

The empirical evidence demonstrates that prison sentences may diminish strong family ties and community support, meanwhile effectuating the criminogenic effect by placing non-violent offenders, like the Defendant, near more serious and violent offenders in prison. *See* Lynne M. Vieraitis, *et al.*, *The Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002*, 6 Criminology & Pub. Pol'y 589, 591-93 (2007) ("imprisonment causes harm to prisoners," isolating them from families and friends, making it difficult to successfully reenter society, and "reinforc[ing] criminal identities" through contacts with other criminals); Miles D. Harer, *Do Guideline Sentences for Low-Risk Drug Traffickers Achieve Their Stated Purposes?*, 7 Fed. Sent'g Rep. 22 (1994) ("[T]he alienation, deteriorated family relations, and reduced employment prospects resulting from the extremely long removal from family and regular employment may well increase recidivism.").

The Sentencing Commission has found that "[t]here is no correlation between recidivism and Guidelines' offense level. . . . While surprising at first glance, this finding should be expected. The Guidelines' offense level is not intended or designed to predict recidivism." U.S.S.C., *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004).

And according to "the best available evidence . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen, *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science,* 91 Prison J. 48S, 50S-51S (2011).

With regard to deterrence, the empirical evidence is unanimous that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime.[5] The Sentencing Commission has found that "[t]here is no correlation between recidivism and Guidelines' offense level. . . . While surprising at first glance, this finding should be expected. The Guidelines' offense level is not intended or designed to predict recidivism." U.S.S.C., *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004). And according to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions."

---

[5]    *See* Andrew von Hirsch *et al., Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

Francis T. Cullen, *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science,* 91 Prison J. 48S, 50S-51S (2011).

To address the issue of just punishment, the Court should consider that Mr. Kazaryan will be taken into ICE custody prior to his release and will be detained for many months pending the disposition of the deportation proceedings. Mr. Kazaryan will likely be deported from the United States and barred from ever returning. He will effectively be cut off from his family. His impending lifelong banishment from the United States amounts to substantial retribution and hardship which, in the long run, will probably prove at least as painful as the current incarceration. He does not have any remaining family ties in Azerbaijan.

Under these circumstances, deportation is "the equivalent of banishment or exile." *Jordan v. De George*, 341 U.S. 223, 231 (1951). As Justice Field observed long ago, "[I]f the banishment of an alien from a country . . . where he may have formed the most tender connections . . . be not a punishment, and among the severest of punishments, it would be difficult to imagine a doom to which the name can be applied." *Fong Yue Ting v. United States*, 149 U.S. 698, 749 (1893) (Field, J., dissenting) (quoting James Madison at 4 Elliott's deb 554, 555). The inevitable collateral consequence of deportation helps to satisfy the statutory requirement under 18 U.S.C. §3553(a) for "just punishment," reflects the "seriousness of the offense" (a deportable offense without remedy) and obviates the need for a harsher sentence than what is being requested herein.

Likewise, the Court may consider the fact that non-citizen defendants, like Mr. Kazaryan are punished more harshly due to ineligibility of halfway house placement as grounds to grant a variance from the Guidelines. *See United States v. Davoudi*, 172 F.3d 1130, 1133-34 (9th Cir. 1999)(ineligibility for halfway house placement can justify downward departure); *United States v. Navarro-Diaz*, 420 F.3d 581, 588 (6th Cir. 2005) (remanded in light of *Booker* where district court noted that defendant would be punished more than a citizen due to ineligibility for halfway house placement).

Also relevant to the issue of sentencing is the fact that Mr. Kazaryan has never been in custody for any significant period of time, much less prison. *See United States v. Collington*, 461 F.3d 805 (6th Cir. 2006) (upholding sentence of 120 months where guideline range was 188-235 months in part because guidelines did not reflect defendant's actual criminal history, that he had only previously served 7 months in prison before the offenses and was an ideal candidate for reform, and that "this incident was the first time that this quantity of drugs and guns had been found in [his] possession"); *United States v. Baker*, 445 F.3d 987 (7th Cir. 2006) (affirming non-guideline sentence of 78 months from 108 months for defendant convicted of distributing child porn, justified in part by judge's finding that prison would mean more to this defendant than one who has been imprisoned before, which resonated with the goals of "just punishment" in § 3553(a)(2)(A) and "adequate deterrence" in Section 3553(a)(2)(B).)

### 3. Sentencing Options

Under the Statutory Provisions, Count 2 carries a mandatory minimum term of imprisonment is 5 years and the maximum term is 40 years. 21 U.S.C. §§ 841(a), 841(b)(1)(B). Count 4 carries a maximum term of imprisonment is 10 years. 26 U.S.C. §§ 5861(d), 5871. 155. Guideline Provisions: Based upon a total offense level of 24 and a criminal history category of V, the guideline imprisonment range is 92 to 115 months.

V.

**CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that the Court impose the minimum 60 month term of imprisonment with a recommendation that he be allowed to serve his prison sentence locally and that he be placed into the 500 hour RDAP program, or other possible alternative program as deemed by the court followed by 3 years of supervised release. The requested sentence would be "sufficient, but not greater than necessary" to achieve the purposes of sentencing.

Date: October __14_, 2015.

Respectfully submitted,


/s/ *Karine Basmadjian*
KARINE BASMADJIAN
Attorney for Defendant
HAYK KAZARYAN